UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIE VIC ORENIA PARUCHA,

               Plaintiff,

     - against -

JEAN-YVES A. MAGNAN and
THERESA L. DURSO,

               Defendants.

---

Civil Action No. 22-CV-7294

**COMPLAINT**

Jury Trial Demanded

---

Plaintiff Marie Vic Orenia Parucha ("Ms. Parucha" or "Plaintiff"), by and through her counsel, The Legal Aid Society and Petrillo Klein & Boxer LLP, brings this action against Defendants Jean-Yves A. Magnan ("Mr. Magnan") and Theresa L. Durso ("Ms. Durso") (collectively, "Defendants") and alleges, based on personal knowledge as to herself and her acts, and upon information and belief as to all other matters, as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     In or around August 2017, Defendants knowingly and willfully lured Ms. Parucha from Hong Kong to New York with false promises of fair pay and reasonable conditions of employment as a live-in domestic caretaker and nanny for Defendants' two young children. When Ms. Parucha arrived in the United States, however, Defendants induced Ms. Parucha to work an average of 16.5 hours per day, for net wages of less than $2.50/hour, through physical isolation, deprivation of food and sleep, threats of police involvement and deportation, psychological and verbal abuse, sexual abuse/harassment, and abuse of legal process. Defendants' egregious conduct violated federal anti-trafficking statutes, New York state labor laws, and the common law.

2.      As described in greater detail below, during Ms. Parucha's live-in employment by Defendants between her arrival to the United States on a B1 domestic worker visa on August 27, 2017 and her escape on December 20, 2017 (the "Relevant Time Period"), Defendants engaged in the following conduct:

- Withheld Ms. Parucha's passport for over a month upon her arrival to the United States, contrary to prior written and/or verbal promises that Ms. Parucha would be able to hold onto her passport.

- Restricted Ms. Parucha's freedom of movement and kept her isolated by prohibiting her from leaving the apartment without permission, barring her from using the phone during work hours, severely limiting her breaks and time off, and directing her not to speak to others.

- Forced Ms. Parucha to work an average of 16.5 hours per day, approximately 7 days a week, for a total of 115.5 hours per week, contrary to Defendants' prior written and verbal promises that Ms. Parucha would be required to work eight hours a day, five days a week, with customary breaks during the day.

- Barred Ms. Parucha from taking any days off, contrary to Defendants' prior written promise that Ms. Parucha would be entitled to 2 days off each week.  During the entirety of Ms. Parucha's employment by Defendants in New York, Defendants only allowed Ms. Parucha to take a few hours off on approximately 6 or 7 occasions.

- Failed to compensate Ms. Parucha adequately for her work, contrary to Defendants' prior written and verbal promises that Ms. Parucha would receive fair pay pursuant to federal and state law.  Defendants paid Ms. Parucha once per month, in the amount of $1,200 in September 2017, and $1,250 in each of October, November, and December 2017, for an average pay of $284.02 for each week of work.  Because Defendants forced Ms. Parucha to work an average of 115.5 hours each week, her compensation averaged approximately $2.46 per hour.

- Prohibited Ms. Parucha from consuming groceries purchased by Defendants or purchasing and storing groceries of her own, making Ms. Parucha reliant on Defendants for basic sustenance.  Defendants severely limited Ms. Parucha's food allowance and regularly denied food as punishment for perceived violations of house rules.  Due to extreme deprivation of food, Ms. Parucha lost approximately 20 pounds between October and December 2017.

- Forced Ms. Parucha to sleep in the corner of Defendants' living room (approximately 325 square-feet) in their New York apartment, contrary to Defendants' prior verbal and written promises that Ms. Parucha would have her own bedroom in Defendants' apartment. Because Defendants typically used the living room until late at night, Ms. Parucha was chronically deprived of privacy and sleep.

- Subjected Ms. Parucha to a torrent of verbal abuse, insults, and threats of deportation and police involvement to obtain Ms. Parucha's compliance and labor.

- Subjected Ms. Parucha to sexual abuse/harassment.

3.     As a result of Defendants' abuse, Ms. Parucha suffers from diagnosed post-traumatic stress disorder, for which she has received counseling.

4.     By this action and pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPA"), the New York Labor Law ("NYLL"), and the common law, Ms. Parucha seeks redress for the serious harm that Defendants inflicted.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff brings claims under the TVPA, 18 U.S.C. § 1595(a).

6.     This Court has supplemental jurisdiction over Ms. Parucha's state law claims pursuant to 28 U.S.C. § 1367(a), because her state law claims form part of the same case or controversy under Article III of the United States Constitution.

7.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this district.

8.     This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

9.      Plaintiff Marie Vic Orenia Parucha is a citizen of the Philippines.  At all times relevant to this action, Ms. Parucha was a live-in domestic worker employed by Defendants in New York, New York.  Ms. Parucha currently resides in Queens, New York.

10.     Upon information and belief, Defendants Jean-Yves A. Magnan and Theresa Durso are residents of the State of New York.  At all times relevant to this action, Defendants resided in New York, New York, and, upon information and belief, reside there to this day.

## STATEMENT OF FACTS

**A.      Defendants Recruited and Trafficked Ms. Parucha to the United States**

11.     In the fall of 2015, while residing in Hong Kong, Defendants hired Ms. Parucha through a third-party placement agency to work as a live-in domestic caretaker and nanny for their two young children.

12.     While in Hong Kong, Defendants paid Ms. Parucha on time in the amount of HK$ 5,600 (approximately U.S. $719) per month pursuant to executed employment contracts dated September 1, 2015 and July 23, 2017.  Defendants also provided Ms. Parucha with her own bedroom, bathroom, and a personal refrigerator.  Ms. Parucha was permitted to take one day off each week, which she usually took on Sundays to attend church.   During the period of her employment in Hong Kong, Ms. Parucha received annual paid leave from December 20 to January 4.

13.     In or around the summer of 2017, Defendants asked Ms. Parucha if she would consider continuing to work for Defendants in New York, where Defendants were relocating on account of Mr. Magnan's job at a large international bank.

14.     Defendants promised Ms. Parucha that she would be paid a higher salary if she relocated to New York, and Ms. Parucha believed the increased wages would permit her to send more money to her husband and children in the Philippines, who depended upon Ms. Parucha's earnings for their living and educational expenses.

15.     Defendants told Ms. Parucha that they would handle the logistics and costs of obtaining a visa necessary for Ms. Parucha to travel to the United States.  In addition, Defendants promised Ms. Parucha that they would assist her with obtaining permanent immigration status in the United States and would petition to obtain the same for Ms. Parucha's husband and children, permitting them to join her in the United States.

16.     Induced by Defendants' promises, Ms. Parucha accepted Defendants' offer to work for them in New York.  On or about August 11, 2017, Defendants and Ms. Parucha executed an initial 4-month employment contract ("Employment Contract") that provided for Ms. Parucha's continued employment by Defendants in New York between August 27, 2017 and December 20, 2017.

17.     The Employment Contract was governed by laws of the State of New York and included the following terms:

    (i)    Ms. Parucha's "duties will be primarily to help [Ms. Durso] care for [Defendants' two children] and [Defendants'] cat";

    (ii)    Ms. Parucha would work "eight hours a day, five days a week, with customary breaks during the day";

    (iii)    Ms. Parucha would be paid the New York state minimum wage of $10.50 an hour, and if Ms. Parucha "work[ed] for more than forty-four hours in any given week" she would be paid overtime wages "at a rate of one and one-half times" her "regular 'straight-time' hourly rate (or US$15.75) for all hours [Ms. Parucha] work[ed] over 44 in a payroll week";

    (iv)    Defendants would pay for Ms. Parucha's round-trip airfare to/from New York;

(v)     Ms. Parucha would have her "own bedroom in the apartment [Defendants] will be renting";

(vi)    While in the U.S., Defendants "will not withhold [Ms. Parucha's] passport.  It will be under [Ms. Parucha's] care"; and

(vii)   Defendants would continue to provide Ms. Parucha with the same insurance coverage and "all other benefits" that she received in Hong Kong.

18.     Ms. Parucha believed that the written Employment Contract and Defendants' supplemental verbal promises would govern the terms of her employment in New York.

19.     In preparation for her travel to the United States, Ms. Durso instructed Ms. Parucha to make an appointment at the U.S. Consulate General in Hong Kong for the purpose of obtaining a U.S. visa.  Ms. Durso also instructed Ms. Parucha on which documents to bring to the consulate and what to say during the visa interview.  Ms. Parucha did as Ms. Durso instructed, and, on August 14, 2017, she received a B1 visa for work as the personal domestic employee of Mr. Magnan.

**B.      Defendants Subjected Ms. Parucha to Forced Labor, Abuse, and Isolation in the United States**

i.      Defendants Withheld Ms. Parucha's Passport Upon Arrival to the United States

20.     On August 27, 2017, Ms. Parucha traveled with Mr. Magnan from Hong Kong to New York on her B1 domestic employee visa.

21.     Upon arrival, Mr. Magnan demanded that Ms. Parucha's turn over her passport to him.  Ms. Parucha complied because she felt that she was in no position to question Mr. Magnan or refuse to do as asked.  Although Ms. Parucha asked Mr. Magnan to return it, Mr. Magnan withheld the passport for weeks on the pretext that he needed it for "legal process paperwork" and "safekeeping."

22.     In October 2017, after Defendants paid Ms. Parucha for her work in September, she again asked Mr. Magnan to return her passport, which Ms. Parucha believed she needed to remit money to her family in the Philippines through a money transfer company (e.g., Western Union).  Mr. Magnan told Ms. Parucha that he would have to think about it.  Mr. Magnan returned Ms. Parucha's passport a few days later, after unlawfully withholding it for over a month.

23.     On the same day that Mr. Magnan returned her passport, Ms. Parucha asked Defendants for a short break so that she could go to the office of a money transfer company to send money to her family in the Philippines.  Ms. Durso responded that Ms. Parucha was not permitted to take a break, and Defendants did not allow Ms. Parucha to leave their apartment for at least two weeks thereafter, which Ms. Parucha understood as punishment for having asked Defendants to return her passport.

ii.     Defendants Restricted Ms. Parucha's Freedom of Movement and Kept Her Isolated

24.     Upon arrival in the United States, Ms. Parucha lived with Defendants on the Upper East Side of Manhattan, first in temporary housing (from late August to late September), and later in a three-bedroom, two-bathroom apartment at East 85th Street and Lexington Avenue, where Defendants kept her isolated using various restrictions enforced through psychological and verbal threats.

25.     For example, when Ms. Parucha had worked for Defendants in Hong Kong, Defendants provided Mr. Parucha with her own set of keys to their apartment.  However, in New York, Defendants did not provide Ms. Parucha with her own set of keys, and Ms. Durso told Ms. Parucha that she could not leave the apartment without Defendants' prior permission.

26.     On the occasions that Ms. Parucha was allowed to leave the apartment, such as to take Defendants' children to the park, Ms. Durso directed Ms. Parucha not to talk to anyone, especially to other nannies.

27.     Ms. Durso instructed Ms. Parucha that she was not allowed to use her mobile phone during the workday and told Ms. Parucha about a nanny who went to jail because she was on her phone when a child under her care fell and got hurt.

28.     Ms. Durso threatened that if Ms. Parucha did not follow Defendants' rules, they would report Ms. Parucha to the police and "have [her] deported."

29.     On some occasions, when Ms. Parucha was at the park with Defendants' children, Ms. Durso would show up unexpectedly.  Ms. Durso explained that she was checking to see whether Ms. Parucha was following Defendants' rules – i.e., not talking to anyone and not using her phone.

30.     Ms. Parucha did as she was told because she believed Ms. Durso's threats.  Alone in a new country and unfamiliar with her rights, Ms. Parucha felt that she had no choice but to comply with Defendants' rules and restrictions.

31.     Barred from leaving the apartment without permission, prohibited from using her phone during the workday, and unable to use her phone in the evening for fear of waking Defendants and/or their children, Ms. Parucha could not call her family in the Philippines regularly while she was employed by Defendants in New York, which furthered her isolation. The only regular communication that Ms. Parucha maintained with her husband and children during this period was through text messages.

iii.   Defendants Imposed Grueling Work Responsibilities and Schedule on Ms. Parucha

32.     Ms. Parucha's main work responsibilities were caring for Defendants' two children.  During the Relevant Time Period, Defendants' older child was 6 or 7, and the younger child was too young for pre-kindergarten.  Each weekday morning, Ms. Parucha would wake the older child, prepare breakfast for the children, help the older child get ready for school, and, if Ms. Durso was out for a run, walk the older child to school while the younger child was in a stroller.  While the older child was in school, Ms. Parucha cared for the younger child.  If Ms. Durso was unavailable in the afternoon, Ms. Parucha would also pick up the oldest from school. In addition, Ms. Parucha was responsible for attending to the younger child during the night whenever the child woke up, which occurred frequently.

33.     Ms. Parucha was also responsible for caring for Defendants' cat, including cleaning the litter box.

34.     In addition, Ms. Parucha was coerced into work responsibilities far beyond the duties identified in her Employment Contract:  doing all housekeeping for Defendants' family of four (including daily cleaning and vacuuming of the 1,425 square-foot apartment), doing all laundry for the family, washing dishes, running errands (such as going to the grocery store or dry cleaners), and doing a substantial part of the cooking and food preparation.

35.     Ms. Durso would closely inspect Ms. Parucha's cleaning and would reprimand Ms. Parucha for perceived shortcomings.  For example, if the bedsheets had wrinkles, Ms. Durso would instruct Ms. Parucha to remake the bed.  Even if Ms. Parucha followed Ms. Durso's

instructions closely, Ms. Durso would find a reason to yell at Ms. Parucha if Ms. Durso

happened to be upset at something else.

36.     By saddling Ms. Parucha with onerous work responsibilities, Defendants coerced

Ms. Parucha to follow an extreme work schedule:  Ms. Parucha began work at approximately

5:30 a.m. and worked until at least 10:30 p.m., approximately seven days a week.

37.     Although the Employment Contract provided that Ms. Parucha would receive

"customary breaks during the day," Ms. Durso rarely allowed Ms. Parucha to take a break.  For

example, on one occasion, Ms. Parucha sat down on the couch in Defendants' living room while

she watched Defendants' younger child play.  When Ms. Durso saw that Ms. Parucha was

sitting, she instructed Ms. Parucha to stand up in order to remain alert.

   iv.    Defendants Did Not Permit Ms. Parucha to Take Any Time Off from Work

38.     During the Relevant Time Period, Ms. Parucha did not once receive a full day off

from work as contemplated by the Employment Agreement.  Ms. Durso specifically told Ms.

Parucha that she could not have full days off on Sundays to go to church, as Ms. Parucha was

allowed to do in Hong Kong.  Attending church was very important for Ms. Parucha, and the

inability to do so during her employment by Defendants in New York compounded Ms.

Parucha's isolation.

39.     During the Relevant Time Period, Ms. Parucha only received a couple of hours

off on approximately 6 or 7 occasions.  Even on these few occasions, Ms. Durso asked

Ms. Parucha to limit her time off and to stay close to Defendants' apartment in case Defendants

needed Ms. Parucha to return to work.  Ms. Durso also instructed Ms. Parucha not to talk to

anyone during her breaks.  On several occasions when Ms. Parucha was out on break, Ms. Durso

called Ms. Parucha to ask that she return to the apartment early.  Ms. Parucha always complied

because she feared that she would be punished if she did not do as asked.

40.     On her rare breaks, Ms. Parucha would go to Western Union to send money to her

family in the Philippines and/or to a nearby McDonald's because she was hungry and tired.  Ms.

Parucha would sometimes take naps at the McDonald's, and, if the restaurant staff noticed her

sleeping, they would wake Ms. Parucha and ask her to leave.

41.     Defendants also required Ms. Parucha to work on holidays.  Once, when

Ms. Parucha asked Defendants for a day off on Columbus Day, which Ms. Parucha noticed was a

day off from school for Defendants' older child, Ms. Durso responded angrily, "You're not

entitled to the day off.  You have to work on holidays."  Ms. Parucha never again asked for a

holiday off and worked on Veterans Day and Thanksgiving Day that year.  While Defendants

went away for Thanksgiving weekend, Ms. Parucha was required to stay at the apartment to

clean it and to care for Defendants' cat.

v.    <u>Defendants Restricted Ms. Parucha's Access to Food</u>

42.     Defendants controlled and restricted Ms. Parucha's access to food, making her

dependent on them for basic sustenance, and periodically limited her rations to maintain Ms.

Parucha in a state of fear and subservience.

43.     Ms. Durso told Ms. Parucha that she was not allowed to buy her own food, to

store any of her own food in Defendants' refrigerator, or to cook her own meals.  Ms. Durso also

rejected Ms. Parucha's request to store dry goods in the luggage that Ms. Parucha kept under her

bed in the living room, on the basis that they might attract rodents.

44.     Ms. Durso did not provide Ms. Parucha with breakfast.  Accordingly, for breakfast, Ms. Parucha resorted to eating leftovers from the children's plates or small bites of banana or toast, which she ate hurriedly when Ms. Durso was not looking.

45.     For lunch, Ms. Durso usually allowed Ms. Parucha to make a peanut butter and jelly sandwich, which was the entirety of what Ms. Parucha ate for lunch.  Even then, Ms. Durso periodically watched Ms. Parucha make her sandwich in order to monitor how much of the peanut butter, jelly, and bread Ms. Parucha was using.  If Ms. Durso felt that Ms. Parucha used too much of the peanut butter, jelly, or bread, she would reprimand Ms. Parucha to use less.

46.     For dinner, Ms. Parucha typically received small servings of whatever Ms. Durso had prepared—often with Ms. Parucha's assistance—for the family.  Ms. Parucha's portions were typically the same size as that of Defendants' older child, who was 6 or 7 years old at the time.  On days when Ms. Durso was upset with Ms. Parucha, she would give Ms. Parucha even smaller portions.  If Ms. Parucha asked for more, Ms. Durso would make it clear that everyone's portion had been allocated precisely and that Ms. Parucha was not entitled to anything extra.  While Defendants ate dinner at the dining room table, Ms. Parucha was required to eat standing in the kitchen.  Ms. Parucha had to eat quickly because she was responsible for clearing the dining room table, cleaning the kitchen, and giving Defendants' younger child a bath as soon as the family finished dinner.

47.     In addition to restricting her daily food intake, Ms. Durso also regularly deprived Ms. Parucha of food as punishment for perceived transgressions.   As a result, Ms. Parucha was able to eat both a lunch and a dinner on only two or three days in a typical week.

48.     For example, one morning, feeling weak from hunger, Ms. Parucha ate an apple from the fruit bowl in the kitchen.  When Ms. Durso noticed the apple was gone, she became

angry and reprimanded Ms. Parucha, "You can't just eat when you want to," and that Ms. Parucha had to ask Ms. Durso for permission before eating any food in the apartment again. That day, Ms. Durso did not provide Ms. Parucha with any food for lunch and only provided a meager amount of food for dinner, which Ms. Parucha understood to be punishment for having eaten the apple.  The following day, when Ms. Parucha asked Ms. Durso for permission to eat an apple, Ms. Durso responded that "the fruit is for my family" and "you can only eat what you have been given."

49.     A few days later, Ms. Parucha drank a can of soda from the kitchen.  When Ms. Durso noticed that a soda can was missing, she again became very angry at Ms. Parucha, yelling that Ms. Parucha did not listen and that "you know the rules[,] you can only eat what you have been given."  After this incident, Ms. Parucha never again took any drinks (other than tap water) or any fruit from the kitchen.  Although Ms. Parucha was often hungry or wanted to drink something other than tap water, she was afraid that taking any food or drink from the kitchen would anger Ms. Durso, who may again limit Ms. Parucha's food as punishment.

50.     To keep from collapsing from inadequate food intake, Ms. Parucha resorted to secretly eating small amounts of nuts that Defendants kept in a container in the kitchen, as Ms. Durso would not notice if a few nuts were gone.  When she was allowed to take a break outside of the apartment, Ms. Parucha would go to the McDonald's or purchase bagels which she would hide on her person and eat quickly during bathroom breaks when Ms. Durso was not watching.

51.     As a result of insufficient food and breaks, Ms. Parucha was constantly hungry and frequently suffered from hunger-induced headaches, dizziness, flashes of light in her vision, and physical and mental fatigue.  Between October 2017 and December 2017, Ms. Parucha's lost 20 pounds in weight, dropping from 116 pounds to 96 pounds.

vi.    Defendants Restricted Ms. Parucha's Access to Sleep and Privacy

52.    Ms. Parucha's conditions of employment also deprived her of adequate sleep. Defendants required Ms. Parucha to sleep in a bed located in the corner of Defendants' living room (approximately 325 square feet), in violation of her Employment Contract, which provided that Ms. Parucha would have her "own bedroom."

53.    Because Defendants would often occupy the living room until late at night, Ms. Parucha (who was regularly working over 16-hour days) was unable to go to sleep until Defendants retired to their bedroom.  Even then, Ms. Parucha's sleep was frequently interrupted because she slept with a baby monitor to care for Defendants' youngest child if the child woke up at night, which occurred regularly.  Neither of the Defendants helped Ms. Parucha on the occasions when the younger child needed care during the night.

54.    Ms. Parucha shared a bathroom with Defendants' older child.  About a week after Defendants moved into their apartment, Ms. Durso reprimanded Ms. Parucha as Ms. Parucha came out of the bathroom, "This is our home, you cannot dirty it.  You have to clean the bathroom every time you use it."  Ms. Durso also instructed Ms. Parucha to use the bathroom quickly, because she did not want the younger child to be unattended (even though Ms. Durso was also in the apartment).  As a result, Ms. Parucha always felt pressure to use and clean the bathroom very quickly, depriving her of even minimal privacy.

55.    Ms. Parucha never requested a private room, as provided by the Employment Contract, because she feared Ms. Durso would become angry and withhold food in retribution for the request.

14

vii.   Defendants Inflicted Verbal, Emotional, and Psychological Abuse on Ms. Parucha

56.   Even as Defendants maintained Ms. Parucha in a permanent state of mental and physical exhaustion through the deprivation of adequate breaks, food, and sleep, they also utilized physical and psychological abuse to keep Ms. Parucha in a state of fear and subservience.

57.   Ms. Durso frequently yelled at Ms. Parucha for perceived mistakes or missteps including: "Why are you doing this?"; "Why are you not using your brain?"; "You are stupid." When Ms. Parucha tried to explain herself, Ms. Durso yelled even louder and would tell Ms. Parucha to "shut up."  Ms. Parucha learned not to say anything in these instances because it only made Ms. Durso angrier.

58.   Ms. Durso frequently threatened that Defendants would report Ms. Parucha to the police and "have [her] deported" if Ms. Parucha did not follow Defendants' rules or created any "problems" for them, which scared Ms. Parucha.

59.   Ms. Parucha feared that Ms. Durso's temper could escalate to the point of physical harm.  Whenever Ms. Durso would become angry, Ms. Parucha would step as far away as possible to avoid any physical confrontation.  Fearful that Ms. Durso could explode in anger at any moment, Ms. Parucha was in a permanent state of high anxiety around Ms. Durso.

60.   For example, on one occasion soon after Defendants and Ms. Parucha moved to New York, Ms. Parucha was out of the apartment, on a rare break, when Defendants' cat dirtied the litter box.  When Ms. Parucha returned to the apartment on time, she did not have a chance to clean the litter box immediately because Ms. Durso told Ms. Parucha to pick up the family's groceries that had been delivered to the building lobby.  As Ms. Parucha entered the apartment with the groceries, Ms. Durso yelled at Ms. Parucha, "Why didn't you clean the litter as soon as

you got home?  Why did you stay out late?  This is why you can't take breaks."  Ms. Parucha

froze in fear and was unable to find the words to explain to Ms. Durso that she had returned on

time and that Ms. Durso was the one who sent her downstairs to pick up the groceries.  Ms.

Durso started yelling louder, saying "Hey lady!  Put down the groceries and go clean up the

poop. Do you hear what I am saying?"  At this moment, Mr. Magnan came out of the bedroom

and told Ms. Durso to stop yelling, but Ms. Durso continued.  Even as Ms. Parucha tried to back

away from Ms. Durso, Ms. Durso got closer and closer to Ms. Parucha until only the grocery bag

that Ms. Parucha was holding was blocking Ms. Durso from Ms. Parucha.  Ms. Durso then

pointer her finger in Ms. Parucha's face said, "You are stupid.  You are not listening."

61.     On another occasion one morning, when Defendants' older child was running late

for school, Ms. Parucha gave the older child breakfast first, rather than at the same time as the

younger child.  Noticing the sibling received breakfast first, Defendants' younger child started to

cry.  When Ms. Durso saw this, she became very angry and threw her full cup of coffee at

Ms. Parucha, yelling, "Look what you have done.  Why did you feed [the older child] first?  You

are so stupid."  The cup missed Ms. Parucha and shattered on the floor.  Immediately, Ms.

Parucha went to clean up the coffee and pieces of the mug.  Ms. Durso did not say anything and

only gave Ms. Parucha a rag.

62.     Ms. Parucha did not complain to Mr. Magnan about Ms. Durso's temper because

Mr. Magnan was not home during the day when some of Ms. Durso's outbursts took place and

because Ms. Parucha feared that if she reported Ms. Durso to Mr. Magnan she would infuriate

Ms. Durso further, causing her to withhold food or otherwise lash out at Ms. Parucha.

viii.    <u>Defendants Underpaid Ms. Parucha in Violation of New York Law</u>

63.    During the Relevant Time Period, Defendants refused to pay Ms. Parucha fair wages for her work, in violation of New York Labor Law, the New York Codes, Rules and Regulations ("NYCRR"), and the Employment Contract.

64.    Despite having agreed to pay Ms. Parucha $10.50/hour, plus overtime if Ms. Parucha worked more than forty-four hours in a week, Defendants only paid Ms. Parucha $1,200 (in cash) for her work in September 2017.  At the end of October, Mr. Magnan told Ms. Parucha that he would increase her pay by $50 per month, to $1,250.  Accordingly, from October to December 2017 Ms. Parucha received $1,250 in cash for each month of work.

65.    With Ms. Parucha working on average 16.5 hours a day (115.5 per week), Ms. Parucha's net compensation averaged to $2.46/hour and included no overtime compensation.

66.    When Ms. Parucha asked Mr. Magnan and Ms. Durso for a wage statement to see her hourly rate and to determine whether Defendants were paying her overtime, Ms. Durso became angry and said, "There's no need to give you a receipt.  We paid you."

67.    By the time that Mr. Magnan paid Ms. Parucha for the month of October 2017, Ms. Parucha knew that $1,250 was insufficient to cover the overtime for all the hours she worked.  Ms. Parucha again asked Defendants for a wage statement, and Ms. Durso responded, "Marie, you should be thankful we are good to you and that we brought you here to the United States.  You should be thankful that we provide you food and a place to stay and that we pay you more than we did in Hong Kong.  If you make any problems for us, you will be deported.  Once you're back in Hong Kong, you will not be able to find work through any agency."

68.     Because Ms. Parucha feared being deported and feared that Ms. Durso would deny her food or otherwise lash out if angered, Ms. Parucha did not ask Defendants for her wage statement again.

ix.     Ms. Parucha Was Coerced to Continue Working for Defendants

69.     Despite highly adverse conditions of employment, Ms. Parucha was compelled by her isolation, her dependence on Defendants, and Defendants' threats to continue working for them.

70.     New to the United States, Ms. Parucha was unaware of her legal rights or know anyone from whom to seek advice about any recourse that might be available to her in such abusive conditions of employment.  Ms. Parucha's isolation was compounded substantially by Defendants who prohibited her from leaving the apartment without permission, limited her breaks and time off, directed her not to speak to others, and made it impossible for her to attend church.

71.     Kept isolated in Defendants' apartment, reliant on Defendants for housing and food, and facing threats of police involvement and deportation, Ms. Parucha felt that she had no choice but to continue working for Defendants despite the adverse conditions of employment.

72.     As a result of Ms. Durso's threats, Ms. Parucha believed that even if she returned to Hong Kong against Defendants' wishes, Defendants could make it impossible for her to find new employment through an agency in Hong Kong, which was the only way to find stable and well-paying domestic work there.  Ms. Parucha found credible Ms. Durso's threats that she would be unemployable in Hong Kong because Mr. Magnan worked in at a large international bank, which Ms. Parucha believed gave Defendants powerful connections and substantial financial resources that could be deployed to Ms. Parucha's detriment.

73.     In December 2017, Ms. Parucha was permitted to take an annual holiday to see her family in the Philippines.  Defendants booked Ms. Parucha's airfare but held on to the tickets.  The day before Ms. Parucha's scheduled departing flight (December 20, 2017), Defendants asked Ms. Parucha to sign a new employment contract for a period of work in New York beginning in January 2018.  Fearful that Defendants would cancel or postpone her annual holiday and/or withhold her wages for December, which had not been paid yet, Ms. Parucha felt compelled to sign the new employment contract.  After Ms. Parucha signed the new contract, Defendants paid Ms. Parucha her wages for December.

x.     Ms. Parucha Was Sexually Harassed/Abused

74.     During the Relevant Time Period, Mr. Magnan subjected Ms. Parucha to verbal and physical sexual harassment/abuse.

75.     On several occasions, Mr. Magnan told Ms. Parucha that she was his "good girl."

76.     In addition, on the evening before Ms. Parucha was scheduled to depart New York for her annual holiday, Mr. Magnan returned home from work while Ms. Parucha was giving Defendants' younger child a bath in the master bathroom.  As Mr. Magnan came into the bathroom to say hi to his child, he placed his hand on Ms. Parucha's rear.  Ms. Parucha was shocked.  When she verbalized her surprise, Mr. Magnan covered her mouth with his hand, which scared Ms. Parucha.  Because the bathroom door was open, Ms. Parucha was also scared of what would happen in the event of discovery by Ms. Durso.  Mr. Magnan then left the bathroom.

77.     Ms. Parucha avoided Mr. Magnan for the rest of the night.  She did not eat any dinner and stayed in her bathroom for a while, afraid to encounter Mr. Magnan in the kitchen and risk further unwanted sexual advances.  After Ms. Parucha put Defendants' children to sleep, she

waited in the bedroom of Defendants' younger child until she heard Mr. Magnan go to his bedroom. Ms. Parucha barely slept that night because she was worried Mr. Magnan would walk into the living room at night and try to touch Ms. Parucha without her permission.

78.   On the morning of Ms. Parucha's scheduled flight from New York (December 20, 2017), Ms. Parucha was in the kitchen eating when Mr. Magnan came in. Ms. Parucha turned her back to him to avoid contact. At that moment, Mr. Magnan came up behind Ms. Parucha and placed one hand around Ms. Parucha's throat and hugged her from behind without saying anything. Ms. Parucha felt violated and scared and pushed Mr. Magnan away, after which she secluded herself again in the bathroom until she heard Mr. Magnan leave for work.

**C.    Ms. Parucha's Escape from Defendants**

79.   On December 20, 2017, Ms. Durso instructed Ms. Parucha to clean the apartment before leaving, after which Ms. Durso arranged for a car to take Ms. Parucha to John F. Kennedy International Airport for her departing flight.

80.   When Ms. Parucha arrived at the airport, she first went to a noodle restaurant because she was hungry. As Ms. Parucha was organizing her travel documents prior to crossing the security checkpoint, she came across a folded paper that summarized the rights of domestic workers in the United States. Ms. Parucha did not remember seeing this paper before. The document stated that U.S. contracts created legal obligations between employers and employees about "payment for the time the employee is required to remain on premises after hours; and the employee's right to leave the premises when not on duty." Prompted by the document, Ms. Parucha recalled the many instances when Ms. Durso did not permit her to leave the apartment for a break. The document also stated that if an employer did not comply with U.S. law or

abused the domestic worker, by, for example, improperly paying the domestic worker, the employer might be subject to sanctions.

81.     Prior to December 20, 2017, while Ms. Parucha was employed by Defendants in New York, she did not have the time or mental space to sufficiently reflect upon the abuses to which Defendants had subjected her.  The document that she found at the airport helped Ms. Parucha understand that, by failing to pay her what she was owed, coercing her into working extreme hours, and controlling her freedom of movement, access to food, and sleep, Defendants had violated Ms. Parucha's rights and their obligations as employers.

82.     Ms. Parucha remembered that Ms. Durso once mentioned that there was a Filipino community in Woodside, Queens, and she decided to leave the airport and go to Woodside. When Ms. Parucha arrived in Woodside, she found a Filipino "Jollibee" fast food restaurant and went inside.  While she sat at the restaurant, a Filipino woman passed Ms. Parucha and, seeing her luggage, asked in Tagalog where Ms. Parucha was going.  Desperate for help, Ms. Parucha explained that she had nowhere to go, and the Filipino woman offered Ms. Parucha to stay at her home temporarily because the woman had been in a similar position previously.

83.     After Ms. Parucha did not return to work in January 2018, Defendants repeatedly called Ms. Parucha.  Ms. Parucha did not answer Defendants' calls and eventually changed her number so that Defendants would not continue calling her.

84.     Defendants also called Ms. Parucha's husband in the Philippines on at least four occasions.  On these calls, Defendants threatened that "if [Ms. Parucha] doesn't return to work for us, we're going to report her to immigration authorities, and she will go to jail and be deported."  After the fourth call from Defendants, Ms. Parucha's husband also changed his phone number.  Defendants' calls to Ms. Parucha's husband scared Ms. Parucha because she

worried Defendants could use their wealth and connections to find and punish Ms. Parucha or her family in the Philippines.

85.    After Ms. Parucha shared more details about her employment by Defendants, the Filipino woman connected Ms. Parucha to a victim services nonprofit organization called Safe Horizon, which helped Ms. Parucha understand that she had been a victim of labor trafficking. The woman also connected Ms. Parucha with a church community, which provided Ms. Parucha with additional help.

86.    In late 2019, Ms. Parucha began working with personnel at Safe Horizon's Anti-Trafficking Program, who prepared a submission on Ms. Parucha's behalf to the New York State Office of Temporary and Disability Assistance ("OTDA") for assistance based on Ms. Parucha's status as a victim of human trafficking.   On January 22, 2020, the OTDA sent Ms. Parucha a "Notice of Confirmation as a Human Trafficking Victim," which stated that the OTDA "determined that [Ms. Parucha] meet[s] the criteria for confirmation as a human trafficking victim in New York State."

87.    In late 2019, at the referral of Safe Horizon, Ms. Parucha began in-person counseling with Restore NYC, a nonprofit organization that assists victims of trafficking, to address anxiety and depression connected to the abuse she experienced during her employment by Defendants.  A Restore NYC therapist eventually diagnosed Ms. Parucha with post-traumatic stress disorder ("PTSD").

88.    To this day, Ms. Parucha continues to suffer from PTSD symptoms:  her hands and knees tremble whenever she has flashbacks to Ms. Durso yelling or Mr. Magnan touching her without permission.  And Ms. Parucha's food intake and dietary habits are still profoundly

affected by Ms. Durso's control and deprivation of food.  For instance, when Ms. Parucha is

upset or depressed, she feels like she is not worthy of food.

89.     The COVID-19 pandemic interrupted Ms. Parucha's in-person counseling

sessions at Restore NYC.  When Restore NYC reopened for in-person services, the agency had a

long waitlist for clinical counseling.  Ms. Parucha remains on the waitlist.

**FIRST CLAIM FOR RELIEF**
**Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1589, 1595**
**(Against Both Defendants)**

90.     Plaintiff realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

91.     Under 18 U.S.C. § 1589(a), it is unlawful to "knowingly . . . obtain[] the labor or

services of a person . . . (1) by means of force, threats of force, physical restraint, or threats of

physical restraint to that person or another person; (2) by means of serious harm or threats of

serious harm to that person or another person; (3) by means of the abuse or threatened abuse of

law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person

to believe that, if that person did not perform such labor or services, that person or another person

would suffer serious harm or physical restraint."  18 U.S.C. § 1589(c)(2) defines "serious harm"

to include "psychological, financial or reputational harm."

92.     Under 18 U.S.C. § 1589(b), it is unlawful to "knowingly benefit[], financially or by

receiving anything of value, from participation in a venture which has engaged in the providing or

obtaining of labor or services by any of the means described in [Section 1589(a)], knowing or in

reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or

services by any of such means."

93.     Here, Defendants knowingly obtained Ms. Parucha's labor or services as a domestic worker by means of threatened and actual physical restraint; threatened and actual serious harm; and abuse of law or legal process by, among other means:

- Intentionally withholding Ms. Parucha's passport;

- Threatening Ms. Parucha with deportation and/or arrest;

- Restricting Ms. Parucha's access to money by paying her meager wages;

- Limiting Ms. Parucha's access to food;

- Isolating Ms. Parucha by controlling who she could talk to and when she could leave the residence;

- Requiring Ms. Parucha to remain at the residence except by limited permission from Defendants;

- Preventing Ms. Parucha from having sufficient and uninterrupted sleep;

- Subjecting Ms. Parucha to repeated psychological and verbal abuse;

- Subjecting Ms. Parucha to sexual harassment/abuse.

94.     In addition, Defendants knowingly implemented a scheme, plan, or pattern intended to cause Ms. Parucha to believe that if she did not perform domestic services for Defendants, she would suffer serious harm.  This scheme, plan, or pattern was implemented by depriving Ms. Parucha of her liberty by withholding her passport as means to coerce her to stay, severely restricting her access to livable wages and food, restricting her ability to leave Defendants' residence, controlling who Ms. Parucha could talk to, depriving her of sleep, threatening to deport and/or arrest Ms. Parucha if she did not follow orders, and subjecting Ms. Parucha to repeated verbal and sexual abuse.

95.     Defendants knowingly benefited, financially or by receiving value, from participation in a venture which they knew or should have known engaged in violations of 18 U.S.C. § 1589, namely Ms. Parucha's services for inadequate or no compensation.

96.     Ms. Parucha brings this claim for relief pursuant to 18 U.S.C. § 1595.

97.     As a direct and proximate result of Defendants' actions, Ms. Parucha has suffered damages in an amount to be established at trial.

98.     Ms. Parucha is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1584, 1595**
**(Against Both Defendants)**

99.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    18 U.S.C. § 1584 makes it unlawful to "knowingly and willfully hold[] to involuntary servitude . . . or bring[] within the United States any person so held."

101.    22 U.S.C. § 7102(8) defines "involuntary servitude" as "a condition of servitude induced by means of . . . any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or . . . the abuse or threatened abuse of the legal process."

102.    In violation of 18 U.S.C. § 1584, Defendants knowingly and willfully brought Ms. Parucha to the United States for the purpose of involuntary servitude and subjected Ms. Parucha to a condition of involuntary servitude for approximately four months in the United States by causing her to suffer, or to believe she would suffer, serious harm in the form of psychological,

physical, reputational, financial, and/or legal harm if she did not continue to work for Defendants.

103. Defendants held Ms. Parucha in a condition of involuntary servitude by severely limiting her access to money, controlling Ms. Parucha's access to food, restricting her ability to leave Defendants' residence, controlling who Ms. Parucha could talk to, depriving her of sleep, threatening to deport and/or arrest Ms. Parucha if she did not follow orders, withholding Ms. Parucha's passport, and subjecting Ms. Parucha to verbal, psychological, and sexual abuse.

104. Defendants used fraudulent misrepresentations, coercion, and intimidation to hold Ms. Parucha in their employ and forced her to work without paying her the compensation required by law.

105. Defendants' actions caused Ms. Parucha to reasonably believe that she had no choice but to continue working for Defendants.

106. Ms. Parucha brings this claim for relief pursuant to 18 U.S.C. § 1595.

107. As a direct and proximate result of Defendants' actions, Ms. Parucha has suffered damages in an amount to be established at trial.

108. Ms. Parucha is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor
in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595
(Against Both Defendants)**

109. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    18 U.S.C. § 1590(a) makes it unlawful to "knowingly recruit[], harbor[], transport[], provid[e], or obtain[] by any means, any person for [peonage, slavery, involuntary servitude, or forced labor]."

111.    Defendants knowingly recruited, transported, harbored, provided and/or obtained Ms. Parucha, bringing her to the United States for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. §§ 1589 and 1592, and therefore violated 18 U.S.C. § 1590.

112.    Defendants knowingly violated the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584(a) and 1589(a)-(b).

113.    Ms. Parucha brings this claim for relief pursuant to 18 U.S.C. § 1595.

114.    As a direct and proximate result of Defendants' actions, Ms. Parucha has suffered damages in an amount to be determined at trial.

115.    Ms. Parucha is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF
**Unlawful Conduct with Respect to Documents in Furtherance of
Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor
in Violation of the TVPA, 18 U.S.C. §§ 1592, 1595
(Against Both Defendants)**

116.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

117.    18 U.S.C. § 1592(a) makes it unlawful to "knowingly destroy[], conceal[], remove[], confiscat[e], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . in the course of a violation of . . . [or] with intent to violate [the provisions under the Trafficking Victims Protection Reauthorization Acts prohibiting trafficking, peonage, slavery, involuntary

servitude, or forced labor]; or . . . to prevent or restrict or to attempt to prevent or restrict, without

lawful authority, the person's liberty to move or travel, in order to maintain the labor or services

of that person, when the person is or has been a victim of a severe form of trafficking in persons."

118.    22 U.S.C. § 7102(11)(B) defines "severe forms of trafficking in persons" to

include "the recruitment, harboring, transportation, provision, or obtaining of a person for labor

or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary

servitude, peonage, debt bondage, or slavery."

119.    Defendants knowingly concealed, removed, confiscated, and/or possessed Ms.

Parucha's passport in the course of a violation of 18 U.S.C. §§ 1589 (forced labor) and 1590

(trafficking) or with intent to violate the same.

120.    Defendants knowingly concealed, removed, confiscated, and/or possessed Ms.

Parucha's passport to prevent or restrict, or to attempt to prevent or restrict, without lawful

authority, Ms. Parucha's liberty to move or to travel in order to maintain her labor or services.

121.    At the time Defendants restricted Ms. Parucha's liberty, Ms. Parucha was a victim

of a severe form of trafficking.

122.    Ms. Parucha brings this claim for relief pursuant to 18 U.S.C. § 1595.

123.    As a direct and proximate result of Defendants' actions, Ms. Parucha has suffered

damages in an amount to be determined at trial.

124.    Ms. Parucha is entitled to recover compensatory and punitive damages in an

amount to be determined at trial, as well as attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**Benefitting Financially from Trafficking in Persons**
**in Violation of the TVPA, 18 U.S.C. §§ 1593A, 1595**
**(Against Both Defendants)**

125.    Plaintiff realleges and incorporates by reference each and every allegation
contained in the preceding paragraphs as if fully set forth herein.

126.    18 U.S.C. § 1593A makes it unlawful to "knowingly benefit[], financially or by
receiving anything of value, from participation in a venture which has engaged in any act in
violation of this chapter, knowing or in reckless disregard of the fact that the venture has
engagedin such violation" to the same extent "as a completed violation of such section."

127.    Defendants knowingly benefitted financially or by receiving something of value,
namely Ms. Parucha's domestic services, from participation in a venture that engaged in
activities in violation of 18 U.S.C. §§ 1584 (involuntary servitude), 1589 (forced labor), 1590
(trafficking), and 1592 (unlawful conduct with respect to documents) and either knew of or were
in reckless disregard of the violation of this provision.

128.    Ms. Parucha brings this claim for relief pursuant to 18 U.S.C. § 1595.

129.    As a direct and proximate result of Defendants' actions, Ms. Parucha has suffered
damages in an amount to be determined at trial.

130.    Ms. Parucha is entitled to recover compensatory and punitive damages in an
amount to be determined at trial, as well as attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**Failure to Pay New York State Minimum Wage**
**in Violation of NYLL §§ 190 *et seq.*, 650 *et seq.*, and 12 NYCRR § 142-2.1**
**(Against Both Defendants)**

131.    Plaintiff realleges and incorporates by reference each and every allegation
contained in the preceding paragraphs as if fully set forth herein.

132.     The NYLL requires that employers pay a minimum hourly wage for covered employees in New York State.  NYLL § 652; 12 NYCRR § 142-2.1.

133.     At all times relevant to this action, Ms. Parucha was an "employee" covered by state minimum wage law.  NYLL §§ 2(5), 190(2), 651(5); 12 NYCRR § 142-2.1.

134.     At all times relevant to this action, Defendants "employed" Ms. Parucha within the meaning of NYLL §§ 2(7), 651.

135.     At all times relevant to this action, Defendants were "employers" within the meaning of NYLL §§ 2(6), 190(3), 651(6).

136.     At all relevant times to this action, Defendants had the power to: (a) hire and fire Ms. Parucha; (b) control Ms. Parucha's schedule; (c) supervise Ms. Parucha; (d) control Ms. Parucha's work conditions in Defendants' household; (e) determine the rate and method of payment of Ms. Parucha's wages.

137.     In all periods of Ms. Parucha's employment, Defendants failed to pay Ms. Parucha the proper minimum wage, as required by New York State law.  NYLL § 650 *et seq.*

138.     During Ms. Parucha's employment, the New York State minimum wage was $10.50 per hour between August 27 and December 20, 2017.  NYLL § 652(1)(a)(ii).

139.     Defendants' failure to pay Ms. Parucha the minimum wage was willful and/or not in good faith.

140.     Ms. Parucha is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage she should have been paid, liquidated damages, prejudgment interest, and attorneys' fees and costs.

141.    For compensatory damages, Ms. Parucha is entitled to the payment of minimum wages in an amount equal to the proper state minimum wage she should have been paid, consistent with New York State minimum wage laws.

### SEVENTH CLAIM FOR RELIEF
**Failure to Pay New York State Overtime Wages
in Violation of NYLL §§ 190 *et seq.* and 650 *et seq.*, 12 NYCRR § 142-2.2
(Against Both Defendants)**

142.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.    Defendants failed to pay Ms. Parucha overtime pay for her work in excess of forty-four (44) hours per week, as required for a residential employee in violation of NYLL §§ 190 *et seq.* and 650 *et seq.* and New York Department of Labor regulations, 12 NYCRR § 142-2.2.

144.    Defendants' failure to pay Ms. Parucha overtime pay was willful and/or not in good faith.

145.    Ms. Parucha is entitled to an award of damages for overtime pay for each hour she worked over forty-four (44) hours per week in an amount equal to the proper overtime pay that she should have been paid, liquidated damages, prejudgment interest, and attorneys' fees and costs.

### EIGHTH CLAIM FOR RELIEF
**Failure to Pay Rate for Spread of Hours That Exceed 10 Hours of Work/Day
in Violation of NYLL §§ 190 *et seq.* and 650 *et seq.*, 12 NYCRR § 142-2.4
(Against Both Defendants)**

146.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

147.    While under Defendants' employ, Ms. Parucha worked more than 10 hours a day for 7 days a week.

31

148.    Defendants failed to pay Ms. Parucha the spread of hours pay required under New York state law, which provides for an extra hour's pay at the rate of the minimum wage for every day that she worked in which the interval between her start and end timeexceeded ten (10) hours, in violation of NYLL §§ 190 *et seq.* and New York State Department of Labor regulations, 12 NYCRR § 142-2.4.

149.    Defendants' failure to pay Ms. Parucha spread-of-hours pay was willful and/or not in good faith.

150.    Ms. Parucha is entitled to an award of an extra hour's pay for every day that she worked in excess of ten hours, liquidated damages, prejudgment interest, and attorneys' fees and costs.

<u>**NINTH CLAIM FOR RELIEF**</u>
**Failure to Furnish Wage Statement in Violation of NYLL § 195(3)**
**(Against Both Defendants)**

151.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    Pursuant to NYLL § 195(3), employers are required to "furnish each employee with a statement with every payment of wages, listing . . . rate or rates of pay and basis thereof, whether paid by the hour, shift,day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages."

153.    Defendants did not maintain proper records for Ms. Parucha's work schedules and pay.  Defendants did not provide Ms. Parucha with wage statements as required by New York state law.  NYLL § 195(3).  Throughout Ms. Parucha's employment, she never received a paystub or any other explanation of her pay or listing of her hours worked.  Defendants never provided Ms. Parucha with an annual wage notice required by state law.

154.   Defendants' failure to provide Ms. Parucha legally adequate wage statements was willful and not in good faith.

155.   Ms. Parucha is entitled to damages of two-hundred and fifty dollars for each week that she did not receive the notice required by NYLL § 195(3), attorneys' costs and fees, together not to exceed $5,000 and injunctive and declaratory relief.  NYLL § 198(1-d)

### TENTH CLAIM FOR RELIEF
**Failure to Pay Promised Wages in Violation of**
**NYLL §§ 190 *et seq.*, 650 *et seq.*, and 12 NYCRR § 142-2.1**
**(Against Both Defendants)**

156.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157.   The NYLL requires employers to pay promised wages for every hour worked. NYLL §§ 190, *et seq.*

158.   For the period of Ms. Parucha's employment, Defendants failed to pay Ms. Parucha the promised wage of $10.50 per hour and the corresponding overtime rate for hours over forty-four (44) hours per week.

159.   Defendants' failure to pay Ms. Parucha the promised wages was willful and/or not in good faith.

160.   Ms. Parucha is entitled to her promised wages, liquidated damages, prejudgment interest, and attorneys' fees and costs.

### ELEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against Both Defendants)**

161.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

162.    Ms. Parucha rendered services as a live-in domestic worker and nanny in good faith and with the expectation that she would be fairly compensated for such services.

163.    Defendants accepted those services and in turn failed to compensate Ms. Parucha for the reasonable and/or fair market value of her services.

164.    Defendants have been unjustly enriched at Ms. Parucha's expense.

165.    Defendants consciously or recklessly disregarded Ms. Parucha's rights.

166.    Equity and good conscience require restitution to Ms. Parucha for the reasonable value of these services.

167.    Accordingly, Ms. Parucha is entitled to recover damages in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### Quantum Meruit (In the Alternative)
### (Against Both Defendants)

168.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

169.    Ms. Parucha rendered services as a live-in domestic worker and nanny in good faith and with the expectation that she would be fairly compensated for such services.

170.    Defendants accepted those services and in turn failed to compensate Ms. Parucha for the reasonable and/or fair market value of her services.

171.    Defendants have benefited from these services at Ms. Parucha's expense.

172.    Defendants consciously and recklessly disregarded Ms. Parucha's rights.

173.    Ms. Parucha should be compensated in quantum meruit in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF
### Fraud
### (Against Both Defendants)

174.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.     During the time Ms. Parucha worked for Defendants, Defendants intentionally and knowingly made false representations and material omissions of fact to Ms. Parucha regarding her labor and her rights under United States law.

176.     Defendants induced Ms. Parucha to work for Defendants in the United States by representing to Ms. Parucha they would pay her for her labor at a rate of $10.50 an hour for 44 hours of work per week when, in fact, they had no intention of paying her at this rate and instead generally paid her $284.02/week, for 115.5 hours of work, which amounts to a rate of approximately $2.46/hour.

177.     Defendants induced Ms. Parucha to stay with and work for them by misrepresenting that they would assist Ms. Parucha petition to have her family join Ms. Parucha in the United States when Defendants had no intention of doing so.

178.     Ms. Parucha did in fact rely on Defendants' misrepresentations to her detriment and as a result was forced to work as a domestic worker for Defendants for little pay.  Ms. Parucha's reliance on Defendants' promises was reasonable given her isolation, control by Defendants, and lack of knowledge about the American legal system.

179.     As a result of these misrepresentations and material omissions of fact made by Defendants, Ms. Parucha endured the psychological abuse that accompanied this situation of involuntary servitude at great psychological and financial detriment.

180.    At the time that Defendants made the foregoing misrepresentations, material omissions of fact, and promises to Ms. Parucha, they had no intention of carrying out such promises and knew that their promises were false.

181.    As the direct and proximate result of Defendants' actions, Ms. Parucha suffered substantial loss of wages and severe pain and suffering, including emotional distress, humiliation, and embarrassment.

182.    Accordingly, Ms. Parucha is entitled to recover damages in an amount to be determined at trial.

<div align="center">

**FOURTEENTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Both Defendants)**

</div>

183.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.    Ms. Parucha and Defendants entered into an agreement, whereby Ms. Parucha agreed to work for Defendants, and Defendants agreed to pay Ms. Parucha $10.50 an hour for 44 hours of work a week, among other promises including overtime pay, time off, expenses paid, and that Defendants would not withhold any personal property, including Ms. Parucha's passport.

185.    Ms. Parucha performed her obligations under the agreement.

186.    Defendants breached the terms of the Parties' contract.

187.    Accordingly, Ms. Parucha is entitled to recover damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Parucha respectfully requests that the Court enter a judgment:

a)        Declaring that Defendants violated the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, the New York Labor Law, and the common law;

b)        Awarding Plaintiff compensatory and punitive damages, including but not limited to, damages for pain and suffering, in an amount to be determined at trial, and such other relief as the Court deems just and proper pursuant to the TVPA;

c)        Awarding unpaid wages, including minimum wage, plus liquidated damages, for Defendants' violations of the NYLL;

d)        Awarding overtime pay, plus liquidated damages, for Defendants' violations of the NYLL;

e)        Awarding statutory damages for Defendants' failure to provide a complete wage statement with every payment of wages;

f)        Awarding compensatory damages for failure to make timely payment;

g)        Awarding compensatory damages for fraud and breach of contract;

h)        Awarding reasonable attorneys' fees, costs, and expenses pursuant to NYLL § 663;

i)        Awarding pre-judgment interest to the extent allowed by law; and

j)        Awarding such other relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Parucha demands a

trial by jury on all questions of fact raised by this Complaint.


Dated:  New York, New York
        August 26, 2022

<div style="margin-left:40%">

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

</div>

By:     */s/  Leonid Sandlar*
        Leonid Sandlar
        John Allen
        655 Third Avenue
        22nd Floor
        New York, New York 10017
        Telephone:  (212) 370-0330
        lsandlar@pkbllp.com
        jallen@pkbllp.com

        THE LEGAL AID SOCIETY

By:     */s/  Sumani Lanka*
        Sumani Lanka
        Young Lee
        199 Water Street, 3rd Floor
        New York, New York 10038
        Telephone: (646) 476-1338
        svlanka@legal-aid.org
        ywlee@legal-aid.org


        *Counsel for Plaintiff*
        *Marie Vic Orenia Parucha*

38